## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | Case No. 16-42529-399<br>CHAPTER 11 |
| Peabody Energy Corporation, et al.,<br><br>                Debtors. | Jointly Administered |
| Tor Braham, Paul Edward Hindelang,<br>Joel Packer, and Boris Senderzon<br><br>                Plaintiffs,<br><br>v.<br><br>Peabody Energy Corporation, Wilmington Trust Company, as Indenture Trustee and Member of the Unsecured Creditors' Committee, Wilmington Savings Fund Society, FSB, as Indenture Trustee and Member of the Unsecured Creditors' Committee, Aurelius Capital Management, LP, Contrarian Capital Management, L.L.C., Discovery Capital Management, LLC, Elliott Management Corp, Panning Capital Management, LP, and PointState Capital LP<br><br>                Defendants. | Adv. Pro. No. _____<br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

COMES NOW the retail noteholders described below (the "Retail Noteholders" or "Plaintiffs"), by and through their undersigned counsel, and for their Complaint, states as follows:

## NATURE OF THE CASE

1.     This complaint is brought by the Retail Noteholders Joel Packer, Paul Edward Hindelang, Tor Braham, and Boris Senderzon against the Wilmington Trust Company ("WTC"), as Indenture Trustee for the Senior Unsecured Notes of Peabody Energy Corporation ("PEC") and as a member of PEC's Unsecured Creditors Committee (the "UCC"), Wilmington Savings Fund Society, FSB ("WSFS"), as Indenture Trustee for the Second Lien Notes of PEC and as a member of the UCC (collectively, the "Indenture Trustees" or the "UCC Members"), PEC (with certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors")), and Institutional Noteholders (defined below) (collectively as to all defendants "Defendants") for breach of fiduciary duties, breach of indenture, breach of tort law duty to avoid conflicts of interest, negligence, and aiding and abetting breach of the fiduciary duty arising from Defendants' inequitable and unlawful treatment of Plaintiffs as holders of notes issued by Debtors.

2.     The Retail Noteholders are individuals who purchased Senior Unsecured Notes and Second Lien Notes of PEC.  The underlying claim of Plaintiffs arises from the unlawful, inequitable, and discriminatory Plan of Reorganization (the "Plan") engineered by Debtors in negotiations with majority hedge fund institutional noteholders of Debtors (the "Institutional Noteholders").  The consequence of these negotiations was that the UCC and Indenture Trustees worked with the Debtors and Institutional Noteholders to exclude Plaintiffs, who own the same notes as Institutional Noteholders, from purchasing shares of Debtors in a heavily discounted

1

preferred equity offering.   As set forth below, the preferred equity offering simultaneously discriminated against Retail Noteholders and bound them to the Plan before it was filed.  This conduct (along with additional allegations set forth herein) violates 11 U.S.C. §§ 1123(a)(4), 1125(a), 1126(e), and 1129(a)(3).

3.     Throughout the underlying bankruptcy proceeding, Indenture Trustees, in their dual roles as Indenture Trustees and UCC Members, owed and continue to owe Plaintiffs various fiduciary duties, duty of care, tort duty to avoid conflicts of interest, and duties under the indentures.  Indenture Trustees breached these duties by, namely, negotiating, advocating for, and ultimately supporting agreements that specifically disadvantage Retail Noteholders in favor of the Institutional Noteholders, whose interests were supposed to be protected by Indenture Trustees.

4.     Throughout the underlying bankruptcy proceeding, the UCC Members have breached their fiduciary duty to adequately represent Plaintiffs by supporting the unlawful Plan that harms Plaintiffs.  The UCC Members bound themselves to accepting the Plan before it was filed, and allowed the Institutional Noteholders (indeed, all noteholders but Retail Noteholders) to acquire heavily discounted preferred equity in Debtors at the expense of Retail Noteholders who were excluded from the offering.

5.     After Debtors initiated the underlying bankruptcy proceeding, Defendants negotiated and entered into agreements with Debtors to purchase this heavily discounted preferred equity in Debtors as part of a Private Placement Agreement ("PPA").

6.     The UCC members have a fiduciary duty to avoid conflicts of interest with the claims that they are responsible for protecting.  The Indenture Trustees should never have

2

negotiated and entered into the discriminatory PPA.  This PPA by its nature caused a conflict of interest among holders of the same notes.

7.      The UCC Members have also misrepresented, by statement and conduct, that they lacked conflicts of interests with the claims represented by the UCC.

8.      Furthermore, Indenture Trustees, by supporting a PPA that discriminates against Retail Noteholders violated their duty of loyalty. They continued his violation thereafter, by supporting the Plan that makes this unlawful discrimination among interests of the same class of security-holders indelible.

9.      Indenture Trustees also breached their respective Indentures by failing to exercise their powers to prevent Institutional Noteholders from discriminating against Retail Noteholders.

10.     The Institutional Noteholders and PEC aided and abetted these violations of fiduciary duty.

11.     Defendants all knew when they supported the PPA and the Plan that they had a conflict of interest.  They have corresponded with the Retail Noteholders and acknowledged that the PPA includes all other noteholders but them.  Debtors and the UCC Members have opposed Retail Noteholders' motion for appointment of an official committee of retail noteholders, assuring the bankruptcy court that they were working on behalf of the Retail Noteholders' interests.  This assertion was false – they could not, and did not, adequately represent Retail Noteholders' claims given their conflicting interests.  Thereafter, UCC Members and Debtors made half-hearted attempts to solve the discriminatory problem they had created.  When they realized that it would be difficult to get the Institutional Noteholders to agree to this (an example of the conflict of interest), they threw up their hands and gave up.  This ongoing conduct and

support of the Plan because it is the path of least resistance constitutes a continuing violation of their fiduciary duties.

## JURISDICTION AND VENUE

12.     Debtors filed a voluntary petition for relief in this Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

13.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

14.     This Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

15.     This action is related to the instant bankruptcy case in that its outcome will affect the relief being sought in the Debtor's bankruptcy case.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408-1409.  The statutory predicates for the relief sought herein are § 1102(a) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

17.     Plaintiff Joel Packer is a holder of the 6% Senior Unsecured Notes, due 2018, issued by Debtors and a creditor in the underlying bankruptcy proceeding.  He is a "Retail Noteholder" in that he is an individual and not an institutional noteholder and for this reason was not allowed to participate in the PPA.  He would be considered an accredited investor under Rule 501 of Regulation D.

18.     Plaintiff Paul Edward Hindelang is a holder of the 6% Senior Unsecured Notes, due 2018, issued by Debtors and a creditor in the underlying bankruptcy proceeding.  He is a "Retail Noteholder" in that he is an individual and not an institutional noteholder and for this

reason was not allowed to participate in the PPA. He would be considered an accredited investor under Rule 501 of Regulation D.

19.    Plaintiff Tor Braham is a holder of the 6.5% Senior Unsecured Notes, due 2020, and Second Lien Notes due 2022. He is a "Retail Noteholder" in that he is an individual and not an institutional noteholder and for this reason was not allowed to participate in the PPA. He would be considered an accredited investor under Rule 501 of Regulation D.

20.    Plaintiff Boris Senderzon is a holder of the 6% Senior Unsecured Notes, due 2018. He is a "Retail Noteholder" in that he is an individual and not an institutional noteholder and for this reason was not allowed to participate in the PPA. He would be considered an accredited investor under Rule 501 of Regulation D.

21.    Plaintiffs have standing to bring this action as parties in interest pursuant to 11 U.S.C. §§ 1109.

22.    Upon information and belief, Defendant WTC is a Delaware corporation having its principal place of business in Wilmington, Delaware. WTC is the Indenture Trustee for the Senior Unsecured Notes of Debtors and a member of the UCC. WTC is a defendant herein in its aforementioned capacities as an indenture trustee and a UCC Member.

23.    Upon information and belief, Defendant WSFS is a Delaware corporation having its principal place of business in Wilmington, Delaware. WSFS is the Indenture Trustee for the Second Lien Notes of Debtors and a member of the UCC. WSFS is a defendant herein in its aforementioned capacities as an indenture trustee and a UCC Member.

24.    Defendant Peabody Energy Corporation ("PEC") is the primary debtor in this bankruptcy proceeding and issued the notes associated with the allegations herein.

25.     Defendant Aurelius Capital Management, LP, acting on behalf of the entities that it manages which acted as holders of "Eligible Private Placement Claims" (as defined in the Plan and herein by reference) or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective affiliates (collectively, "Aurelius"), is incorporated in Delaware with its principal place of business in New York and is a "Noteholder Co-Proponent" of the Plan (as defined in the Plan and herein by reference).

*26.*     Defendant Contrarian Capital Management, L.L.C., acting on behalf of itself or the entities that it manages as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective affiliates, including Contrarian Dome due Couter Master Fund, L.P., Contrarian Opportunity Fund, L.P., Contrarian Capital Senior Secured, L.P., Contrarian Capital Trade Claims, L.P., Contrarian Advantage-B, L.P., Contrarian  Emerging Markets, L.P., and Contrarian EM SIF Master L.P. (collectively, "Contrarian"), is incorporated in Delaware with its principal place of business in Connecticut and is a Noteholder Co-Proponent of the Plan.

27.     Defendant Discovery Capital Management, LLC, acting on behalf of itself or the funds or entities that it manages as holders of any Eligible Private Placement Claims as defined in the Plan or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective affiliates applicable (collectively, "Discovery"), is incorporated in Connecticut with its principal place of business in Connecticut and is a Noteholder Co-Proponent of the Plan.

28.     Defendant Elliott Management Corp, acting on behalf of itself or the funds or entities that it manages as holders of any Eligible Private Placement Claims as defined in the Plan or investment advisors or managers of such holders, as applicable, and in each case, certain

of their respective affiliates (collectively, "Elliot"), is incorporated in Delaware with its principal place of business in New York and is a Noteholder Co-Proponent of the Plan.

29.     Defendant Panning Capital Management, LP acting on behalf of itself or the entities that it manages as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective affiliates (collectively, "Panning"), is incorporated in Delaware with its principal place of business in New York and is a Noteholder Co-Proponent of the Plan.

30.     Defendant PointState Capital LP acting on behalf of itself or the entities that it manages as holders of Eligible Private Placement Claims or investment advisors or managers of such holders, as applicable, and in each case, certain of their respective affiliates (collectively, "PointState"), is incorporated in Delaware with its principal place of business in New York and is a Noteholder Co-Proponent of the Plan.

31.     Defendants Pointstate, Panning, Elliot, Contrarian, and Aurelius are collectively referred to as the "Institutional Noteholders".

**BACKGROUND ON PEC AND NOTES**

32.     PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  Peabody's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers.  As of December 31, 2015, Peabody and its subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements.  In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons

of proven and probable coal reserves, and generated sales of approximately 180 million tons of coal.  *Id.*  In addition to their mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

33.     During its operation, Debtors issued among other debt:  "2018 Senior Notes," "2021 Senior Notes," "2020 Senior Notes,"   "2026 Senior Notes," and "2022 Second Lien Notes."

34.     Wilmington Trust Company is the Indenture Trustee for most of those notes. Wilmington Savings Fund Society, FSB, is the Indenture Trustee for the 2022 Second Lien Notes.

**DISPARATE TREATMENT**

35.     On April 29, 2016, the U.S. Trustee appointed Creditors' Committees, including the UCC, in these Chapter 11 cases.  Both Indenture Trustees caused themselves to be appointed as UCC Members.

36.     Committees and their members are responsible for protecting the interests of the creditors that they represent.  Accordingly, committees and their members owe strict fiduciary duties to such creditors.  Among these strict duties are to not act adversely to the class' interests, to treat all interest-holders of the class equally, and to avoid conflicts of interest and self-dealing. Therefore, since April 29, 2016 creditors' committee members owed these strict fiduciary duties to Plaintiffs and other Retail Noteholders, which belong to the class represented by Defendants.

37.     To develop a Chapter 11 Plan, Debtors "engaged in multi-day, in person negotiations with, among others, the First Lien Lenders, the Creditors' Committee, the Second Lien Noteholders' Group and the Ad Hoc Noteholders," and made "considerable progress toward a consensual plan."  *See* Second Motion of the Debtors for an Order Extending Their

Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (the "Second Exclusivity Motion") [Doc. No. 1676], at 10).  However, that "consensu[s]" excluded the Retail Noteholders, who were not on or adequately represented by any Creditors' Committees.

38.     Then, on or about December 22, 2016, Debtors and certain institutional hedge fund creditors (the Institutional Noteholders), after negotiations, arranged a wildly complex and self-interested Plan that excluded Retail Noteholders.  The negotiating parties entered into the Plan Support Agreement ("PSA") to pledge support of the Plan, once filed.  Entering into the PSA was a prerequisite to participate in the Private Placement Agreement ("PPA"), which allows institutional noteholders to invest in preferred equity in Debtors at a substantial discount the fair value of Debtors.  Debtors afforded the opportunity to enter into these agreements to only preexisting institutional creditors, including Institutional Noteholders.  The PPA, negotiated by Debtors, specifically excludes Retail Noteholders.  The exclusion occurs in part in the definitions section : "'Additional Private Placement Party' means each party that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or an *Institutional* Accredited Investor . . . .'"  (emphasis added).

39.     "Accredited investors" under the securities laws are not limited to institutions, and indeed could include Plaintiffs, but Debtors and others Defendants added this "*Institutional*" limitation nonetheless, which unlawfully discriminates among holders of the same notes, such as Plaintiffs.  The affirmative decision to include this limitation was intentional and willful.  The affirmative decision not to rectify this exclusion, particularly after notice from the Retail Noteholders, was also intentional and willful.

40.     Retail Noteholders were excluded from not only entering into the PPA but also were not part of the negotiations regarding it and the Plan.  The entities representing Plaintiffs

9

interests in these negotiations were the UCC and the Indenture Trustees.  For this purpose and throughout, the Indenture Trustees and UCC also refers to their agents.

41.    Debtors filed the massively complicated Plan, which includes the PSA and PPA, and thousands of other documents, just before Christmas break and provided extremely limited time for institutional noteholders to determine whether they wished to join.  Delay of a few days in making the decision penalized the noteholder to the advantage of the Institutional Noteholders. In any event, Retail Noteholders were excluded entirely; they were never offered any time to participate, short or long.    Thus, even if they had been able to instantaneously respond over the holidays, they were never afforded even a short window to defend their interests and participate in the dilutive financing priced at a deep discount to the fair market value of the securities offered.

42.    This unreasonably small window was intentional and defies business judgment. In an email admitted into evidence, Mr. Cowan, a Managing Director of Lazard, which is Debtors' financial advisor for the Plan, assured an interested investor in the PPA that "given the three-day window," less than 54% of the noteholders would come enter into the PPA at Phase 2 (i.e., the shorter, less penalized period).  This runs contrary to the goal of financing, especially debtor-in-possession financing, which is to raise as much capital as possible at a price favorable to the issuer.  Instead, the Debtors and Defendants devised a measure to keep out potential investors.  The purpose was to obtain a greater share of the new equity for the small number of institutions who were the plan proponents, at a great discount and at the expense of other entitled creditors, such as Retail Noteholders.

43.    The PPA provides significant benefits to its parties purchasing the securities.  The PPA grants the exclusive right to the "Noteholder Co-Proponents" (the Institutional Noteholder

defendants here) to purchase 22.5% of the Preferred Equity and the exclusive right to the holders of the Second Lien Notes and Senior Unsecured Notes to purchase *pro rata* an additional 5% of the Preferred Equity. Additional institutional noteholders that become party to the PPA at a later, specified time may purchase a *pro rata* share of the remaining 72.5% of the offered Preferred Equity. This equity has valuable preferences and dividend rights that render them more valuable than the common stock. Yet, the PPA offers this equity at a 35% discount to a stated value, which itself vastly undervalues PEC's equity. Furthermore, by excluding Retail Noteholders, the Institutional Noteholders are able to purchase the shares that should have gone to the Retail Noteholders. This is evident by the results of the arrangement according to the Plan: Co-Proponents (the Institutional Noteholder defendants here) would acquire a disproportionately larger share of new equity under the PPA than Retail Noteholders. By some estimates, all Retail Noteholders constitute 5-7% of the notes associated with the PPA.

44.     The PSA confers additional benefits onto its parties. First, it allowed institutional noteholders to enter into the extremely valuable, below-market PPA investment. Second, as a *qui pro quo* for this benefit (conferred upon the institutional noteholders who hold an estimated 90-95% of the relevant notes) the PSA precludes its parties from objecting or voting against the Plan. In this way, the majority institutional noteholders who subscribe to the PPA and thus vote for the Plan tyrannize the Retail Noteholders.

45.     The dynamic of this construct is to cause a tyranny-of-the-majority situation – i.e., a classic conflict of interest for the UCC Members despite their fiduciary duty to avoid such conflicts with UCC creditors, such as Retail Noteholders.

46.     Expert testimony and evidence in the underlying bankruptcy hearings illustrate that the Institutional Noteholder Defendants (who were Plan proponents) stood to benefit far more from the Plan than other interest groups, including most dramatically Retail Noteholders.

47.     Worse, the UCC members excluded the creditors most vulnerable to being disadvantaged, the Retail Noteholders.  This is a classic breach of fiduciary duty.

48.     Debtors' PPA Motion, at ¶ 36, and the Disclosure Statement, at ¶ 97, both misleadingly deny the relationship between this investment opportunity given to the Institutional Noteholders and their status as noteholders.  *See* Debtors' Motion For An Order (I) Approving (A) Private Placement Agreement And (B) Backstop Commitment Agreement; (II) Authorizing Debtors To Enter Into (A) Plan Support Agreement, (B) Private Placement Agreement And (C) Backstop Commitment Agreement; (III) Approving (A) Rights Offering, (B) Related Procedures And (C) Payment Of Related Expenses And (IV) Granting Related Relief ("PPA Motion") [Doc. No. 1834], at ¶¶ 35-36 ("[T]he right and obligation to purchase shares in the Private Placement is not on account on (sic.) any claim held by any of the purchasing Noteholders and is, thus, separate and apart from any distribution rights a creditor may possess under the Plan.").  This denial is not only false but also suspect in that Debtors made such a disclaimer prior to Plaintiffs' challenges or objections as to the PPA's propriety and lawfulness.  Clearly, Debtors and Defendants knew, by their own design, of the PPA's unlawfulness and sought out to construct an excuse in bad faith in order to unfairly and unlawfully advantage themselves to the detriment of Plaintiff and other Retail Noteholders.

49.     Indeed, the falsity of the statement in paragraph 36 is revealed in the very same paragraph.  That is, in the paragraph that Debtors deny any connection between holding PEC notes and the opportunity to enter into the PPA, PEC admits to the contrary: "[t]o the extent that

the holders of claims on account of the Second Lien Notes and Senior Unsecured Notes wish to participate in the Private Placement . . . ."  *Id*. at ¶ 36.  The veneer that the PPA has nothing to do with the Plan is belied by Defendants' own double-speak.  This serves to show that the PPA has as one of its primary purposes to provide enough consideration to other institutional noteholders that they will quickly support the Plan.  Defendants have admitted as much, saying that they sought to broaden the scope of the PPA to offer it to all noteholders in order to obtain "consensus" for the Plan.  That payoff for consensus did not include the minority Retail Noteholders.

50.     In other words, the PPA is an integral, embedded, and inseparable part of the Plan. In order to enter into the PPA, the investors had to agree to vote in favor of the Plan that was not yet filed at the time.  Therefore, the PPA was instrumental to obtaining sufficient (though an unlawfully unrepresentative) consensus for the Plan.  That Defendants included the vast majority of noteholders in order to get their agreement is itself proof that all of the bankruptcy parties understand that the PPA is not a separate financing but rather, a single, integrated arrangement that is part of the Plan.  The problem with their construct however is that it treats holders of the same note differently, causing indelible conflicts of interest.

51.     Therefore, to mischaracterize the PPA as a mere financing opportunity distinct from the Plan is an intellectually dishonest attempt to circumvent the Bankruptcy Code.  The PPA is the basis for the apportionment of Debtors' assets to creditors and as such, violates 11 U.S.C. § 1123(a)(4) due its discriminatory treatment of Retail Noteholders.  Furthermore, the bad-faith runaround of the Bankruptcy Code in seeking Plan confirmation violates 11 U.S.C. § 1129(a)(3).

52.     Although Retail Noteholders are among a group that is provided a token cash pool, this pool is problematic because it has no guaranteed payoff and is only priced to approximate the payoff under the Plan excepting the real value of the PPA.  That is, the cash pool does not remotely compensate Retail Noteholders for their loss.  The pool is capped at $.50 per face value of the bond, an inadequate alternative.  Moreover even the $.50 payoff is misleading as claims coming to this pool quite likely will outstrip the amounts that would allow for a distribution this high.

53.     In addition to the foregoing valuations as to Plaintiffs' deprived opportunity, Plaintiffs suffered loss to the value of their notes.  Because the PPA substantially devalued Plaintiffs' notes, it effectively transferred value from Plaintiffs' notes to the preferred equity purchased under the PPA by institutional noteholders (and Debtors' management).  Therefore, Defendants, by negotiating and entering into the PPA, put their interests in conflict with Plaintiffs' interests, which constitutes another breach of fiduciary duty to Plaintiffs.  Moreover, in doing so, Defendants misappropriated and/or converted value from Plaintiffs' notes, which is another breach of fiduciary duty.

54.     The UCC Members made statements in its filings with this Court that the cash option provides an equivalent value to the value being received by the Institutional Noteholders.  Such a statement is false and misleading.

55.     The exclusion of Plaintiffs and other Retail Noteholders from the PPA, caused in part by the willful acts and omissions of Defendants, harmed Plaintiffs.  Since the PPA became public (and expired), the price of PEC's unsecured Notes dramatically declined.  Furthermore, Retail Noteholders were wrongfully deprived the investment opportunity to which they were entitled as noteholders.  The Plan, because of the PPA, would allow the institutional investors to

14

recover an estimated minimum of 50 percent more value on their bonds than the Retail Noteholders.

56.     The exclusion was unnecessary.  Defendants, without justification, determined that only institutions have been allowed to participate as they are Qualified Institutional Buyers ("QIB") under Rule 144A of the Securities Act.  The Disclosure Statement does advise that QIBs and "institutional 'accredited investors'" under Rule 501(a) of Regulation D of the Securities Act are allowed to participate.  However, there is a vehicle for individuals to participate under Rule 501(a)(5)-(6) of Regulation D of the Securities Act, but UCC Members, Debtors and the Institutional Noteholders have *chosen* not to allow such investors to participate.  Moreover, Debtors and the UCC have not sought commensurate consideration for depriving Plaintiffs of this opportunity.

57.     To ensure consensus on the unlawful Plan, the PPA had to provide substantially more consideration than the typical one.  Accordingly, the PPA functioned as not merely a means to secure consensus but as compensation to part of a class of security-holders to approve an unlawful plan.

**DEFENDANTS' FURTHER CONDUCT**

58.     A month after the filing of the PSA, Retail Noteholders sought to have a retail noteholder committee be appointed.  The UCC Members opposed that application because, as they represented to the Court, they were perfectly capable of looking out for the interests of the Retail Noteholders.  In part due to the UCC Members' (and their agents') false assurances to the Court that they would adequately represent Retail Noteholders' interests, this Court denied the formation of the committee.

59.     Since the denial of that application it is apparent that Defendants had already concluded that they did not believe there was any opportunity for the Retail Noteholders to participate with the institutional noteholders in the value offered under the PPA.  In other words, they refused to ameliorate the conflict of interest that they themselves constructed.

60.     Further, the Institutional Noteholders specifically decided that they did not need to provide any change to rectify the conflict of the PSA/PPA.

61.     Plaintiffs believe that Defendants will continue to support the Plan.  In doing so, the UCC Members continue to violate their fiduciary duties to Retail Noteholders.  In addition, Plaintiffs' counsel mailed Defendants a letter dated to request that they withdraw their support for the Plan.  They have explicitly refused.

62.     Thus, to this day the Indenture Trustees are ignoring the conflict that the PPA created.  Indeed, they have represented to Plaintiffs that they have not prejudiced them by entering into the PPA.

**IMPROPER SOLICITATION AND INADEQUATE DISCLOSURE STATEMENT**

63.     The solicitation in this case is improper at it violates 11 U.S.C. §§ 1125 and 1126(e).  Here, Defendants negotiated, signed and advocated for the PSA.  The consequence was to create a tyranny-of-the-majority situation among noteholders within the same class.

64.     The solicitation is improper because it was made in "bad faith."  11 U.S.C. § 1126(e).  "If a person seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith."  _In re_ Figter Ltd., 118 F.3d 635, 639 (9th Cir. 1997); accord Young v. Higbee Co., 324 U.S. 204, 210-211, 65 S. Ct. 594, 598, 89 L. Ed. 890 (1945); _In re_ Lloyd McKee Motors, Inc., 157 B.R. 487, 488-89 (Bankr. D.N.M. 1993) ("[The] inquiry is 'whether a vote was cast for the ulterior purpose of securing some advantage to which the

creditor would not otherwise have been entitled.'") (quoting *In re* Marin Town Center, 142 B.R. 374, 378-379 (N.D. Cal. 1992); *In re* Sandia Resorts, Inc., No. 15-11532, 2016 WL 6879249, at *6 (Bankr. D.N.M. Nov. 4, 2016) (citation omitted); see also *In re* Landing Assocs., Ltd., 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) ("out of keeping with the purpose of the reorganization process itself") (citation omitted).  Here, the PSA requires approval of the Plan, which includes the PPA that unlawfully discriminates against Retail Noteholders.  The "ulterior purpose" for the discrimination is for parties to the PPA and PSA to obtain a greater share of the offered equity than "would not otherwise have been entitled."  *In re* Lloyd McKee Motors, 157 B.R. at 488-89.  Therefore, the solicitation is improper due to bad faith.  Such violations, in addition to some breaches of fiduciary duty, warrants designation of the improperly solicited votes.

65.    Furthermore, Defendants engaged in this improper solicitation instead of objecting to the Plan, which constitutes a breach of their fiduciary duties to Retail Noteholders. Defendants had full knowledge of discrimination and the bad-faith, ulterior motive because it was also their motive and they negotiated the terms.  Therefore, by signing (or advocating for) the PSA, they engaged in the improper solicitation instead of objecting to it, which is another breach of their fiduciary duty.

66.    Lastly, to avoid liability and responsibility for their own wrongful, willful self-dealing and negligent acts, the Defendants included in the Plan a comprehensive set of releases and waivers,  thus purporting to require all parties who are wronged by such self-dealing acts to lose all right to contest and seek judicial recompense for such acts.  It is a further breach of their fiduciary duties and a further conflict of interest for the Defendants to attempt to shield themselves from liability, accountability and judicial scrutiny by demanding an across-the-board

blanket waiver and release, thus seeking to escape any judicial review of the legality of their own self-dealing actions.

## REQUIREMENTS UNDER THE INDENTURES

67.    Various provisions in the indentures of the notes listed above expressly require the equal treatment of, and empower its Indenture Trustee to ensure the equal treatment of, all Noteholders, particularly minority Noteholders.

68.    The 6.00% senior unsecured notes due November 2018 and 6.25% senior unsecured notes due November 2021 were issued under an indenture dated November 15, 2011 among PEC, as the issuer, the Encumbered Guarantor Debtors, the Gold Fields Debtors, as guarantors, and Wilmington Trust Company, as the indenture trustee, as modified, amended, supplemented, or otherwise revised, and together with all instruments, documents, and agreements related thereto (the "2018/2021 Indenture").

69.    The 6.50% senior unsecured notes due September 2020 were issued under an indenture dated March 19, 2004 among PEC, as the issuer, the Encumbered Guarantor Debtors, the Gold Fields Debtors, as guarantors, and Wilmington Trust Company, as the indenture trustee (the "2020/2026 Base Indenture"), as modified, amended, supplemented (by, including but not limited to, the Thirty-Third Supplemental Indenture, or "2020 Thirty-Third Supplement" dated August 25, 2010), or otherwise revised, and together with all instruments, documents, and agreements related thereto (collectively, the "2020 Indenture").

70.    The 7.875% senior unsecured notes due November 2026 were issued under the same 2020/2026 Base Indenture , as modified, amended, supplemented (by, including by not limited to, the Eleventh Supplemental Indenture dated October 12, 2006 (the "2026 Eleventh Supplement") and the Twenty-Third Supplemental Indenture dated November 14, 2007 (the

"2026 Twenty-Third Supplement")), or otherwise revised, and together with all instruments, documents, and agreements related thereto (collectively, the "2026 Indenture").

71.     The 10.00% senior second lien notes due March 2022 were issued under an indenture dated March 19, 2004 among PEC, as the issuer, the Encumbered Guarantor Debtors, the Gold Fields Debtors, as guarantors, and Wilmington Trust Company, as the indenture trustee, as modified, amended, supplemented, or otherwise revised, and together with all instruments, documents, and agreements related thereto (the "Second Lien Notes Indenture").

72.     The Indentures expressly state throughout the document that one of its primary goals is to treat all Noteholders equally and fairly.  To achieve this end, the Indentures empower and require the Indenture Trustees to prevent prejudice toward any Noteholders, particularly minority Noteholders like Retail Noteholders.  The Indentures also expressly disclaim any right for any Noteholder to use the Indenture to prejudice another Noteholder.

**The First Relevant Provision**

73.     Section 6.05 above was included to put the onus on the Indenture Trustees to protect minority Noteholders like the Retail Noteholders from prejudicial treatment by the majority Noteholders.

74.     Section 6.05 of the 2018/2021 Indenture, the 2020 Indenture, the 2026 Indenture, and Second Lien Notes Indenture (collectively, the "Indentures") provides (partial emphasis added):

> ***Control by Majority***.
> . . . [I]n case an Event of Default shall occur and be continuing, the Trustee will be under no obligation to exercise any of its rights or powers under this Indenture at the request or direction of any of the Holders, unless such Holders shall have offered to the Trustee reasonable indemnity against any loss, liability or expense. . . . *Notwithstanding the foregoing, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the*

19

> *Trustee determines may be unduly prejudicial to the rights of other*
> *Holders or that may involve the Trustee in personal liability.*

75.     Notably, the emphasized sentence above in Section 6.05 is not limited to directions from other Noteholders.  Indeed, "[n]otwithstanding the foregoing," the Indenture Trustee is empowered to refuse "any direction" that would result in the specified consequences.

76.     The PPA is explicitly limited to those with "Eligible Private Placement Claims," which are claims on the notes issued under the Indentures.  Therefore, a person or entities' status as a Noteholder of a note or notes under the Indentures served as the basis for the opportunity to negotiate and enter into the PPA.  However, this status was further limited to institutional noteholders only, not individual noteholders, such as Retail Noteholders.

77.     The PPA, a negotiated agreement, is necessarily the product of directions from those involved in the negotiations.  The Indenture Trustees were involved in those negotiations, agreed to the PPA, and supported the PPA.  Therefore, the very existence of the prejudicial PPA necessitates that Indenture Trustees failed to "refuse to follow [] direction[s]" that were "unduly prejudicial to the rights of other Holders" during the negotiations.

78.     Additionally, because Institutional Noteholders, which sought to optimize the returns on their "Eligible Private Placement Claims," negotiated, agreed to, and entered into the PPA, the PPA is the product of their directions as well.  Therefore, by entering into the PPA, Indenture Trustees not only failed to refuse to follow but wholly accepted the Institutional Noteholders' directions that prejudice Retail Noteholders.

79.     Furthermore, as explained in this Complaint, because the PPA violates the law, for example, the Bankruptcy Code by treating holders of the same class of interests differently, the Indenture Trustee failed to "refuse to follow [] direction[] that conflict[s] with law."

20

**The Second Relevant Provisions**

80.     The Indentures also prohibit the Noteholders from using the Indenture to prejudice or otherwise harm another Noteholder.

81.     Section 6.06 of the 2020 Indenture and 2026 Indenture provides (with emphasis in the original):

> *Limitation on Suits*. A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

82.     Section 6.06 of the 2018/2021 Indenture and Senior Lien Notes Indenture provides (with emphasis in the original):

> *Limitation on Suits*. A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

83.     The PPA provides a preference or priority to certain Noteholders over others.  As parties the PPA, especially initial parties, Institutional Noteholders obtain a preference and or priority over Retail Noteholders' claims by being able to buy more preferred equity at more discounted prices.  Therefore, by negotiating, agreeing to, and entering into the PPA, the Institutional Noteholders "use[d]" in the PPA "to prejudice the rights of another Holder."

84.     Furthermore, because the Indenture Trustees were involved in these negotiations, they allowed and agreed with Institutional Noteholders to "use" the Indentures in the PPA to prejudice the rights of Retail Noteholders.

**The Third Relevant Provision**

85.     Section 6.10 of the 2018/2021 Indenture, 2020 Indenture, and 2026 Indenture, and Senior Lien Notes Indenture requires that "[i]f the Trustee collects any money" under the Article in which that section appears, the Indenture Trustee "shall pay out the money . . . to Holders . . . ratably, without preference or priority of any kind . . . ."

21

86.     The PPA is "in respect of the Notes" because it limits its parties based on the Indentures.  Therefore, if any Indenture Trustee "collects any money" from the PPA as related to the Article IV of the Indenture containing Section 6.10, the Indenture Trustee "shall pay out the money . . . ratably, without preference or priority of any kind," to Noteholders.

87.     Furthermore, Section 6.10 speaks to the spirit of the Indentures, which intend to assure fair, equal treatment of all Noteholders.

**The Fourth Relevant Provisions**

88.     Section 7.08 of the 2018/2021 Indenture and Second Lien Notes Indenture provide (with emphasis in the original):

> ***Conflicting Interests***.
>
> There shall at all times be a Trustee who shall at all times satisfy the requirements of Section 310(b) of the TIA (as if the TIA applied to this Indenture). If at any time the Trustee shall cease to be eligible in accordance with this Section 7.08, it shall eliminate such conflict within 90 days or resign in the manner and with the effect hereinafter specified in this Article VII.

89.     Similarly, Section 6.08 of the 2020/2026 Base Indenture provides (with emphasis in the original):

> ***Disqualification; Conflicting Interests***.
>
> The Trustee for the Securities shall be subject to the provisions of Section 310(b) of the Trust Indenture Act during the period of time required thereby. . . . In determining whether the Trustee has a conflicting interest as defined in Section 310(b) of the Trust Indenture Act with respect to the Securities of any series, there shall be excluded Securities of any particular series of Securities other than that series.

90.     Indenture Trustees, by negotiating with Institutional Noteholders and not Retail Noteholders, and by agreeing to the PPA, created "[c]onflicting [i]nterests."  The Indentures require their respective Indenture Trustees to treat all Noteholders equally and without prejudice.

However, by negotiating with only some Noteholders, as required by the PPA, Indenture Trustees positioned themselves to obtain the approval of Institutional Noteholders without regard to Retail Noteholders.  Indenture Trustees failed to both eliminate its conflicting interests within 90 days and resign as Indenture Trustee, thereby violating this Section.

91.     The foregoing Sections 6.08 and 7.08 also underscore that fairness to and equal treatment of all Noteholders is the essence of the Indentures and that the Indenture Trustees are empowered and required to ensure that end.  This is further illuminating given that all of the Indentures expressly require compliance with the Trust Indenture Act, which renders the "Conflicting Interests" sections superfluous.  The Indentures nevertheless include a "Conflicting Interests" section to emphasize the significance of such conflicts.

**The Fifth Relevant Provisions**

92.     The Indentures include an additional provision with especially strong language explicitly stating that they provide no right to any Noteholder to prejudice or impair another Noteholder's rights.

93.     Section 5.05 of the 2020/2026 Base Indenture provide (with emphasis in the original):

> *Proceedings by Holders*. . . . [I]t being understood and intended, and being expressly covenanted by the taker and Holder of every Security with every other taker and Holder and the Trustee, that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all such Holders.

94.     Section 7.04 of the 2018/201 Indenture and Second Lien Notes Indenture goes even further by stating that no act or omission by any party to the indenture, not just Noteholders, or any noncompliance by any person with the indenture, may prejudice or impair the rights of Noteholders to enforce the indenture.  That section provides (with emphasis added):

> No right of the Second Priority Debt Parties, the Second Priority Representatives or any of them to enforce any provision of this Agreement or any Second Priority Debt Document *shall at any time in any way be prejudiced or impaired* by any act or failure to act on the part of the Borrower or any other Grantor or *by any act or failure to act by any Second Priority Debt Party or Second Priority Representative, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement*, any of the Second Priority Debt Documents or any of the Junior Priority Debt Documents, regardless of any knowledge thereof which any other Second Priority Representative, or any Second Priority Debt Party, or any of them, may have or be otherwise charged with.

95.     By negotiating, agreeing to, and entering into the PPA, the Institutional Noteholders and Indenture Trustees were enforcing (or aiding to enforce) the respective Indenture or Indentures.   In doing so, Institutional Noteholders and Indenture Trustees "prejudiced or impaired" Retail Noteholders' rights to enforce their Indenture or Indentures, notably, in being free from prejudicial treatment by Indenture Trustees and Institutional Noteholders.

**Additional Relevant Provisions**

96.     The Indentures contain other provisions that prohibit prejudicial treatment of Noteholders and empower Indenture Trustees to prevent such prejudicial treatment.

97.     Section 21.03 of the 2018/201 Indenture and Second Lien Notes Indenture empowers the Indenture Trustee to sue the government in order to "prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents or this

Indenture, . . . to preserve or protect its interests and the interests of the Holders in the Collateral," and to prevent acts that are "prejudicial to the interests of Holders or the Trustee."

98.     Section 5.07 of the 2018/2021 Indenture and Second Lien Notes Indenture, which concerns the "Purchase Right," begins by "[w]ithout prejudice to the enforcement of the" Noteholders and Indenture Trustee.

99.     These provisions prove that prejudicial treatment of any Noteholder of the sort that occurred in connection with the PPA violates the Indentures.

## CAUSES OF ACTION AGAINST WTC AND WSFS AS MEMBERS OF THE UCC

### COUNT I

### (Breach of Fiduciary Duty)

100.     Plaintiffs repeat all allegations as if fully set forth herein.

101.     Creditors' committees and their members owe strict fiduciary duties of loyalty and care to their respective constituent creditors for the purposing of maximizing the value of the constituents' investments. The duty of loyalty requires that committees and their members must avoid conflicts of interest, self-dealing, bribery, violations of law, misappropriation and conversion of their constituents' interests, and advancing their own interests and the expense of their constituents' or otherwise discriminate among the constituents' interests.

102.     WTC and WSFS, in their capacities as UCC Members, breached their fiduciary duties to unsecured creditors, such as Plaintiffs, by engaging in conduct that favored their own interests to the exclusion of their constituent creditors, including but not limited to: (i) negotiating the PPA, which excludes Retail Noteholders and consequently; (ii) willfully negotiating the PPA to exclude noteholders; (iii) entering into the PPA, which excludes Retail Noteholders; (iv) supporting the resulting Plan that discriminates against Retail Noteholders by

way of the PPA embedded in the Plan; (v) engaging in the improper solicitation of their own acceptances of the Plan, which was not yet filed, in violation of 11 U.S.C. § 1125; (vi) supporting an overly restrictive "lock-in" agreement that prevents them from acting in their constituents' best interests; (vii) failing to seek and obtain adequate compensation for harm to Retail Noteholders; (viii) disregarding its findings, if any, that the cash pool insufficiently compensated Retail Noteholders for their losses; (ix) by way of the aforementioned acts, engaging in self-dealing, (x) by way of the aforementioned acts, creating conflicts of interests, (xi) by way of the aforementioned acts, advancing their own and other constituents' interests at the expense of Retail Noteholders; (xii) by way of the aforementioned acts, misappropriating value of Retail Noteholders' interests; (xiii) by way of the aforementioned acts, converting Retail Noteholders' interests; (xiv) violating statutory law by supporting an un-confirmable Plan by way of the Plan's discriminatory treatment of Retail Noteholders under 11 U.S.C. § 1123(a)(4) and the inadequate Disclosure Statement under 11 U.S.C. § 1125; and (xv) devaluing the interests of all of their constituents by supporting an un-confirmable plan, the rejection of which would further prolong the already costly bankruptcy proceeding that would reduce the estate available to creditors.

103.    The duty of care requires the fiduciary to execute its responsibilities with reasonable care, skill, and diligence.

104.    WTC and WSFS breached their duty of care to their constituent creditors by engaging in conduct that includes but is not limited to: (i) failing to accurately value the PPA's cash pool for non-participating noteholders; (ii) failing to accurately value the PPA's preferred equity offerings; (iii) failing to accurately compare the values of the cash pool and preferred

equity offerings; and (iv) failing to achieve sufficient compensation for Retail Noteholders' losses.

105.    The fiduciary duty of candor requires disclosure of all material facts, which in this case, are those bearing upon the value and treatment of the committees' constituent interests.

106.    WTC and WSFS breached their duty of candor by engaging in acts and making statements that constitute material misrepresentations or omissions, including but not limited to: (i) causing themselves to be appointed as UCC Members and acting as UCC Members and the UCC itself, Defendants implicitly or explicitly represented that they would act in their constituents' best interests, which they ultimately did not by engaging in the aforementioned acts described in this Complaint; (ii) making false and misleading statements and omissions in filings before this Court that deprive Plaintiffs of complete and accurate information regarding material facts; (iii) misrepresenting in written correspondence through the UCC's counsel to one Plaintiff that if the disparate treatment of Retail bondholders were not fixed, the UCC would file an objection to the PPA, but thereafter, neither fixing the disparate treatment nor objecting to it – and contradictorily, filing a statement in support of the PPA, which caused the PPA to be approved, whereas objecting to the PPA would have almost certainly caused its rejection; and (iv) misrepresenting to this Court that they would, but never did, look after the best interests of Retail Noteholders.

107.    These breaches of fiduciary duties caused harm to Plaintiffs by (i) devaluing their interests; (ii) depriving them of the opportunity to acquire greater interests as entitled to them by their status as noteholders; (iii) limiting their access to material information in order to act in their own best interests with respect to their interests; and (iv) depriving them of the opportunity to obtain adequate representation by representing themselves in their own Retailer Noteholders

Committee, as opposed to being forced into representation by the UCC, which has failed to represent their interests.

## CAUSES OF ACTION AGAINST EACH INDENTURE TRUSTEE IN ITS CAPACITY AS INDENTURE TRUSTEE

### COUNT II

### (Post-Default Breach of Indenture)

108.    Plaintiffs repeat the allegations of all paragraphs as if fully set forth herein.

109.    The Indenture and Subordinated Lien Indenture are valid indentures.

110.    Each Plaintiff is a holder of notes issued under either or both Indentures (collectively, the "Indentures").

111.    Indenture trustees must fulfill the duties provided by their indentures.

112.    Each Indenture states that its respective Indenture Trustee must at all times operate in accordance with all applicable federal and state laws.  Such laws include the Trust Indenture Act of 1939 ("TIA"), the Bankruptcy Code, and New York law.  New York law reflects the TIA.

113.    Under New York law, after an event of default as defined in the indenture, indenture trustees' duties "resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture." Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 597-98 (S.D.N.Y. 2015) (internal quotations and citations omitted).  "The trustee is not required to act beyond [the Indenture but] . . . must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." Id.  In this regard, New York law mirrors that of TIA. Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 655

F. Supp. 1281, 1286 (S.D.N.Y. 1987), aff'd, 838 F.2d 66 (2d Cir. 1988).  This law informs the degree to which Indentured Trustees should have acted with respect to their duties under their respective Indenture.

114.    As discussed herein, various provisions in each Indenture expressly require the equal treatment of, and empower its Indenture Trustee to ensure the equal treatment of, all Noteholders, particularly minority Noteholders.  A few of these provisions are described again below.

115.    First, under each Indenture, Noteholders shall not use the Indenture "to prejudice the rights of" or "obtain a preference or priority over" another Noteholder of the same series.

116.    Each Indenture Trustee, as a UCC Member, negotiated and entered into the PPA that excluded Retail Noteholders but included Institutional Noteholders of the same series. Despite acting in their capacities as UCC Members, Indenture Trustees were still bound their duties under their respective Indenture but to the degree "of a fiduciary."  By engaging in such negotiations, Indenture Trustees encouraged, facilitated, and planned how Institutional Noteholders would prejudice the rights of or obtain a preference or priority over Retail Noteholders.  This flies in the face of fiduciary standards and therefore, constitutes a breach of indenture by each Indenture Trustee.

117.    Second, each Indenture states that in dealing with a request from a majority bondholder, the Trustee has the right to "refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other holders or that may involve the Trustee in personal liability."  This provision empowers the Indenture Trustees to prevent the harm prohibited by the prior provision.

118.    Indenture Trustees failed to fulfill the foregoing duty with the level of care required of a fiduciary.  Indenture Trustees did in fact follow the directions of the Institutional Noteholders that conflicted with law and the Indenture as to prejudicing the rights of other Noteholders.  Indenture Trustees did so by engaging in conduct that includes but is not limited to: (i) negotiating the PPA with Institutional Noteholders but not Retail Noteholders; (ii) allowing the PPA to be offered to Institutional Noteholders but not Retail Noteholders; and (iii) agreeing to the PPA on these terms, all of which violated bankruptcy law and prejudiced the rights of Retail Noteholders by discriminating against interest-holder in the same class.  Accordingly, each Indenture Trustee breached its respective Indenture.

119.    Third, regarding priority, moneys recovered must be paid out "to Holders for amounts due and unpaid on such Notes . . . ratably without preference or priority of any kind, according to the amounts due and payable on such Notes."  This adds force to the duties upon the Indenture Trustees to treat all Noteholders equally and fairly, but Indenture Trustees failed to adhere to this provision as discussed herein.

120.    Fourth, Indenture Trustees created "conflicting interests" and failed to either eliminate the conflict or resign.

121.    Fifth, Indenture Trustees' actions and failures to act prejudiced or impaired Retail Noteholders' rights under the Indentures.

122.    Sixth, Indenture Trustees' noncompliance with the Indentures prejudiced or impaired Retail Noteholders' rights under the Indentures.

123.    These breaches caused Institutional Noteholders to benefit at the expense of Retail Noteholders, who suffered losses.

124.    Accordingly, each Indenture Trustee is liable to its respective Retail Noteholder-Plaintiff(s) for breach of indenture.

## COUNT III

### (Negligence)

125.    Plaintiffs repeat all allegations as if fully set forth herein.

126.    Each Indenture provides that no provision "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."   Indeed, Indenture Trustees like anyone else is bound by the duty of reasonable care.

127.    Here, Indenture Trustees negotiated with Institutional Noteholders and agreed upon the discriminatory PPA that excludes Retail Noteholders.  This conduct against certain Noteholder interests is clearly willful misconduct and at the very least, negligence.  Further, Indenture Trustees failed to stop Institutional Noteholders from prejudicing against and obtaining preference or priority over Retailer Noteholders' interests.   This conduct is ongoing.  Accordingly, Indenture Trustees breached their duty of care to Retail Noteholders.

128.    These acts and omissions that breached their duty of care to Retail Noteholders caused Noteholders to suffer losses.

129.    Therefore, Indenture Trustees are liable to Plaintiffs in negligence.

## COUNT IV

### (Breach of Tort Duty to Avoid Conflicts of Interest)

130.    Plaintiffs repeat the all allegations as if fully set forth herein.

131.    Under New York law, prior to default, indenture trustees must "(1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care.  These

two pre-default obligations are not construed as '*fiduciary* duties,' but as obligations whose breach may subject the trustee to *tort* liability." <u>Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n</u>, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) (internal quotations and citations omitted) (emphases in original).

132.    Indenture Trustees not only failed to avoid but affirmatively created conflicts of interest between them and Retail Noteholders in various ways, including but not limited to: (i) negotiating and entering into a PPA that discriminating among their Noteholders; and (ii) signing the PSA that bound them to supporting a Plan and Disclosure Statement that violated law and regardless of any amendments.

133.    The foregoing acts constitute a breach of Indenture Trustees' tort duty to avoid conflicts of interest.

134.    This breach caused damages to Plaintiffs for which Indenture Trustees are liable.

**CAUSES OF ACTION AGAINST DEBTORS AND INSTITUTIONAL NOTEHOLDERS**

**COUNT V**

**(Aiding and Abetting Breach of Fiduciary Duty)**

135.    Plaintiffs repeat all allegations as if fully set forth herein.

136.    WTC and WSFS, as UCC Members, breached their fiduciary duties to Retail Noteholders.

137.    Debtors and Institutional Noteholders knew that WTC and WSFS were UCC Members and therefore, owed fiduciary duties to Plaintiffs and other Retail Noteholders.

138.    Nevertheless, Debtors and the Institutional Noteholders provided intentional assistance for their own benefit to WTC and WSFS in furtherance of their breaches of fiduciary

duties to Plaintiffs by allowing WTC and WSFS to participate in the negotiations of and support the PPA that excluded and disadvantaged Retail Noteholders.

139.    Therefore, Debtors and the Institutional Noteholders knew of WTC and WSFS's breaches of fiduciary duties to Plaintiffs.

140.    As a result of the foregoing, Debtors and the Institutional Noteholders aided and abetting WTC and WSFS in their breaches of fiduciary duties to Plaintiffs.

## CAUSE OF ACTION AGAINST INSTITUTIONAL NOTEHOLDERS

## COUNT VI

### (Breach of Indenture)

141.    Plaintiffs repeat all allegations as if fully set forth herein.

142.    At all relevant times, Institutional Noteholders owed duties to Retail Noteholders under the Indentures as set forth herein.

143.    Institutional Noteholders breached their duties owed to Retail Noteholders under the Indentures as set forth herein.

144.    The breaches of the Indentures by Institutional Noteholders caused Retail Noteholders to suffer harm as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, as a result of the foregoing, Plaintiff respectfully requests the following:

      a.  Entry of Judgment against Defendants for damages sustained in an amount to be determined at trial;

      b.  Removal of Indenture Trustees from the UCC;

      c.  Establishment of Official Committee of Retail Noteholders;

d.  Subordination of Defendants' claims and entitlement under the Plan and PPA

until Plaintiffs have been justly compensated;

e.  Designation of Defendants' votes on the Plan;

f.  Award Plaintiffs their attorneys' fees and costs; and

g.  Such other or additional relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: March 9, 2017                         **KIRBY McINERNEY LLP**
New York, New York

By:        _/s/ David Kovel_____
David Kovel, Esq.
825 Third Avenue, 16th floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: dkovel@kmllp.com

*Counsel for Plaintiffs Paul Edward Hindelang,*
*Joel Packer, and Boris Senderzon*

**WALTRIP & SCHMIDT, L.L.C.**

By:        _/s/ Michael A. Becker_
Michael A. Becker
8151 Clayton Rd.
Saint Louis, MO 63117
Telephone: (866) 282-5555
Facsimile: (314) 880-7755
Email: mikebeckerlaw@gmail.com

*Counsel for all Retail Noteholders*

34